E-filing

1  TRENT W. ORR, State Bar No. 77656
   GREGORY C. LOARIE, State Bar No. 215859
2  Earthjustice
   426 17th Street, 5th Floor
3  Oakland, CA 94612
   Tel (510) 550-6725
4  Fax (510) 550-6749
   torr@earthjustice.org; gloarie@earthjustice.org
5
   TIMOTHY J. PRESO, *Pro Hac Vice*
6  Earthjustice
   209 S. Willson Avenue
7  Bozeman, MT  59718
   Tel. (406) 586-9699
8  Fax (406) 586-9695
   tpreso@earthjustice.org
9
   SIERRA B. WEAVER, *Pro Hac Vice*
10 Defenders of Wildlife
   1130 17th Street, NW
11 Washington, DC  20036-4604
   Tel. (202) 682-9400, ext. 263
12 Fax (202) 682-1331
   sweaver@defenders.org
13
   *Counsel for Plaintiffs*
14

FILED

MAY - 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

15            UNITED STATES DISTRICT COURT
16      FOR THE NORTHERN DISTRICT OF CALIFORNIA
                  OAKLAND DIVISION

ADR

17

18  DEFENDERS OF WILDLIFE, SIERRA CLUB, )   Case No.   C08-02326 EMC
    THE WILDERNESS SOCIETY, and          )
19  VERMONT NATURAL RESOURCES           )
    COUNCIL,                             )
20                                       )
            Plaintiffs,                  )   **COMPLAINT FOR DECLARATORY**
21                                       )   **AND INJUNCTIVE RELIEF**
            vs.                          )
22                                       )
    ED SCHAFER, Secretary, U.S. Department of )
23  Agriculture, in his official capacity; GAIL )
    KIMBELL, Chief, U.S. Forest Service, in her )
24  official capacity; and U.S. FOREST SERVICE, )
                                         )
25          Defendants.                  )
                                         )
26

27

28

1

**INTRODUCTION**

2      1.    This case involves the continuing efforts of the current U.S. Department of

3   Agriculture, acting through its agency the U.S. Forest Service (both agencies referred to collective

4   here as "Forest Service"), to revoke important and longstanding regulatory protections for the 193-

5   million-acre National Forest System.  Through its action challenged in this case, the Forest Service

6   has once again eliminated from the regulations governing planning and management of the national

7   forests (referred to generically as "NFMA Regulations") environmentally protective standards

8   required to be in these regulations by the National Forest Management Act ("NFMA"), 16 U.S.C. §

9   1600 *et seq.*  The NFMA Regulations govern virtually every significant action on every acre of each

10  of the 155 national forests and 20 national grasslands.  Defendants have accomplished this

11  abandonment of resource protection standards contained in prior versions of the NFMA Regulations

12  through the deletion of such standards from their latest version of revised NFMA Regulations

13  published in the Federal Register April 21, 2008.  73 Fed. Reg. 21468.  Plaintiffs challenge the

14  rulemaking that concluded with that publication of the revised regulations and accompanying Record

15  of Decision, as well as the Final Environmental Impact Statement ("FEIS") prepared on that

16  rulemaking.  *Id.*

17     2.    Since their adoption in 1982, a set of NFMA Regulations ("1982 Rule") have

18  mandated a number of vital protections for the natural environments of the national forests,

19  including regulations that require that each national forest be managed to maintain viable

20  populations of existing native species, that "management indicator species" be identified and

21  monitored as indicators of the health of forest ecosystems, that harmful management practices not be

22  employed within 100-foot buffer zones around water bodies to protect water conditions and fish

23  habitat, and that wildlife habitat needs be accounted for in livestock grazing decisions.  Further, the

24  1982 Rule provides detailed standards and procedures for identifying national forest lands not

25  suitable or appropriate for timber production.  These and associated regulations have operated for

26  more than two decades to protect wildlife and fish, soils, water quality and quantity, slope stability,

27  outdoor recreation, scenic vistas, and other public resources of the National Forest System.  The

28  1982 Rule imposes an important check on national forest management, ensuring that the agency's

1  authorization of logging, oil and gas drilling, and other development activities does not lead to the
2  destruction of valuable environmental resources.

3        3.      However, in the years since the 1982 Rule was promulgated, the Forest Service has
4  repeatedly violated its protective provisions, most particularly by failing in a number of instances to
5  take legally required steps to ensure that environmentally harmful activities on the national forests
6  do not push wildlife populations past the point of viability.  Despite a series of judicial decisions
7  finding the Forest Service in violation of the 1982 Rule, the agency generally has not attempted to
8  modify its actions to ensure compliance with the wildlife viability regulations.  Instead, the Forest
9  Service under the current administration has sought to repeal nearly all of the detailed resource
10  standards in the 1982 Rule through a radical revision of the NFMA Regulations that itself does not
11  comport with the requirements of NFMA.

12        4.      The rulemaking challenged here is not the current administration's first attempt to
13  revise the NFMA Regulations to eliminate existing resource protection standards.  On January 5,
14  2005, the Department published a final rule revising the NFMA Regulations ("2005 Rule") in a
15  manner that stripped them of virtually all of the resource protection standards that the NFMA
16  expressly requires these regulations to provide.  Such protections were contained in the 1982 Rule
17  and, in a different form, in a revised set of NFMA regulations published in November 2000 ("2000
18  Rule").  The 2000 Rule has never been used to guide the adoption or revision of management plans
19  for the individual national forests because of the change of administrations shortly after their
20  publication and the new administration's subsequent suspension of that rule.  The plaintiffs in this
21  action challenged the 2005 Rule as having been promulgated in violation of the Administrative
22  Procedure Act ("APA"), 5 U.S.C. §§ 553, 701-706, and the National Environmental Policy Act
23  ("NEPA"), 42 U.S.C. § 4321 *et seq.*  *Defenders of Wildlife, et al. v Johanns, et al.*, no. 04-4512 PJH,
24  First Supplemental Complaint (N.D. Cal., filed Feb. 17, 2005).  A second case challenging the 2005
25  regulations also alleged that the regulations had been promulgated in violation of the Endangered
26  Species Act, 16 U.S.C. § 1530 *et seq.* ("ESA").  *Citizens for Better Forestry, et al. v. U.S. Dept. of*
27  *Agriculture, et al.*, no. 05-1144 PJH, Complaint (N.D. Cal., filed Mar. 21, 2005).  Following
28  consolidated briefing and argument on motions for summary judgment in these two cases, the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    3

1   District Court ruled that the 2005 Rule had been promulgated in violation of the APA, NEPA, and

2   ESA, set aside the regulations, and issued an injunction against their implementation until such time

3   as the statutory violations were cured. *Citizens for Better Forestry v. USDA*, 481 F.Supp.2d 1089,

4   1100 (N.D. Cal. 2007).

5       5.      The rulemaking challenged in this case is the final rule revising the NFMA

6   Regulations in a manner that once again strips the regulations previously in effect of many resource

7   protection standards. With minor exceptions, it is substantially identical to the 2005 Rule. The new

8   NFMA rulemaking is referred to herein as the "2008 Rule."

9       6.      Defendants' promulgation of the 2008 Rule violated NEPA though their failure to

10  prepare an adequate environmental impact statement on the 2008 Rule, despite the far-reaching

11  environmental impacts that the 2008 Rule's abandonment of environmentally protective standards

12  will have on national forests across the country. The FEIS prepared on the rulemaking contains no

13  analysis whatsoever of the potential impacts on the natural resources of the national forests of

14  adopting the 2008 Rule as compared to other regulatory regimes put forth as alternatives, including

15  the 1982 Rule and the 2000 Rule.

16      7.      If plaintiffs prevail on the merits of their claims, they intend to seek attorneys' fees

17  and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

18              **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

19      8.      Plaintiffs bring this action pursuant to the APA, 5 U.S.C. §§ 701-706. This Court has

20  jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and may issue a

21  declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02. An actual controversy

22  exists between plaintiffs and defendants.

23      9.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e) because plaintiff

24  Sierra Club is incorporated in this district and maintains its headquarters in the County of San

25  Francisco. Moreover, more than 1.5 million acres of national forest lands lie within the Northern

26  District of California.

27      10.     Assignment to the Oakland Division of this judicial district is proper because there

28  are national forests in the counties of Del Norte, Humboldt, and Mendocino. Civil L. R. 3-2(c), (d).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    4

**PARTIES**

11.    Plaintiff Defenders of Wildlife ("Defenders") is a non-profit conservation organization founded in 1947 and based in Washington, D.C., with offices across the country. Defenders has more than 530,000 members and supporters across the nation. Defenders is dedicated to protecting and restoring all native wild animals and plants in their natural communities.

12.    Plaintiff Sierra Club is a non-profit conservation organization founded in 1892, with headquarters in San Francisco, California, and more than 1,300,000 members and supporters nationwide. The mission of the Sierra Club is: "To explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments."

13.    Plaintiff The Wilderness Society ("TWS") is a non-profit environmental organization founded in 1935, with its headquarters in Washington, D.C. TWS has approximately 200,000 members and nine regional offices. TWS works to protect America's wilderness and inspire people to care for wild places. Protecting national forest areas is vital to achieving TWS's mission.

14.    Plaintiff Vermont Natural Resources Council ("VNRC") is a non-profit conservation organization founded in 1963, representing approximately 5,000 members who support the protection and maintenance of the ecological health and integrity of Vermont's natural resources, including the Green Mountain National Forest. Maintaining the diversity of species in Vermont, protection of sensitive ecological areas, maintaining intact blocks of forestland, and promoting sustainable forestry are key conservation components in VNRC's forest program.

15.    All of the plaintiff organizations commented on both the rulemaking that led to the 2008 Rule and on the inadequacies of the draft EIS on the 2008 Rule. Plaintiffs Defenders, Sierra Club, and TWS also informed their members of and encouraged them to participate in the rulemaking process.

16.    Plaintiffs and their members use the lands in the National Forest System for recreational, scientific, aesthetic, conservation, and commercial purposes. Plaintiffs and their members have a strong interest in the environmental protections afforded to national forest lands by

1   the NFMA and by the Forest Service's prior NFMA regulations, which regulations defendants have

2   sought to rescind and replace through the rulemaking challenged in this case.  This strong interest

3   includes an interest in those provisions of the 1982 Rule containing standards that, among other

4   things, required the NFMA-required plan for each unit of the National Forest System ("forest plan")

5   to provide for maintaining viable populations of existing native and desired non-native vertebrate

6   species, required the identification and monitoring of "management indicator species" as indicators

7   of the health of forest ecosystems, proscribed management practices within 100-foot buffer zones

8   around water bodies to protect water conditions and fish habitat, required wildlife habitat needs to be

9   accounted for in grazing decisions, and provided detailed guidance for identifying national forest

10  lands not suitable or appropriate for timber production.  Similarly, plaintiffs have a strong interest in

11  parallel provisions of the 2000 NFMA Regulations, under which no forest plan has been

12  promulgated or revised to date, which the 2008 Rule is also intended to supplant.  These provisions

13  include requirements that forest plans provide a high likelihood that habitat conditions will support

14  viable populations of all native and desired non-native species of all taxa, that "focal species"

15  indicative of the integrity of the larger ecosystems they inhabit will be identified and monitored, that

16  the first priority for national forest management is to maintain and restore ecological integrity of the

17  national forests, and that detailed information will be gathered on a variety of resources to assist in

18  maintaining and restoring ecological integrity.

19      17.    Plaintiffs and their members seek to view, study, hunt, fish, and otherwise enjoy

20  wildlife and signs of the presence of wildlife, including rare, imperiled, and sensitive wildlife

21  species, in the national forests; to benefit from healthy national forest watersheds, which they use

22  and rely upon for drinking water, swimming, fishing, boating, aesthetic appreciation, and other

23  activities; to observe and study trees and other national forest plant life, and to gather fruits, nuts,

24  and other wild plant materials as permitted in the national forests; and to enjoy the natural scenery of

25  the national forests.  The elimination of resource protection standards effected by the 2008 Rule

26  threatens plaintiffs' and their members' interests in all of these uses of and benefits from

27  ecologically healthy national forests.  Further, plaintiffs and their members have a procedural

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                            6

1  interest in influencing national forest management through participation in the development of

2  meaningful, substantive forest plans as prescribed by the NFMA.

3       18.    The above-described recreational, scientific, aesthetic, conservation, consumptive,

4  participatory, and commercial interests of plaintiffs and their respective members have been, are

5  being, and, unless the relief prayed for in this complaint is granted, will continue to be adversely

6  affected and irreparably injured by defendants' violations of NEPA, as described below.  In

7  particular, defendants' challenged actions injure plaintiffs and their members by eliminating

8  substantive, enforceable environmental requirements of the NFMA Regulations that govern both the

9  formulation of forest plans and site-specific projects and actions within the National Forest System.

10 Plaintiffs' and their members' procedural interest in participating in the development, amendment,

11 and revision of forest plans is injured by the 2008 Rule's rendering public input effectively

12 meaningless by converting previously binding forest plans into largely discretionary documents

13 irrelevant to forest management activities on the ground, effectively allowing any forest plan

14 developed with public involvement to be readily amended to accommodate inconsistent timber sales

15 and other projects.  Moreover, plaintiffs' and their members' procedural interests are injured by the

16 2008 Rule's strong encouragement to the Forest Service officials responsible for revising forest

17 plans to perform such revisions without the preparation of an environmental review document

18 pursuant to NEPA, on the assertion that forest plans are paper exercises with no impacts on forest

19 resources.  This would deny plaintiffs and their members detailed information on the potential

20 environmental effects of a proposed revised forest plan, the careful examination and comparison of

21 alternatives to that plan, the formulation of measures to mitigate the revised plan's adverse impacts,

22 and an opportunity to comment on all of these matters.

23      19.    Defendants' failure to comply with NEPA in the promulgation of the 2008 Rule, by

24 preparing a grossly inadequate environmental impact statement containing no analysis of the

25 potential environmental impacts of the 2008 Rule or of the alternatives to that rule, injures plaintiffs

26 and their members by denying them the information that NEPA requires about those potential

27 impacts — direct, indirect, and cumulative with other actions — of the new rule, about

28 environmentally superior alternatives to that rule, and about mitigation measures available to address

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                              7

1   the significant impacts identified; by denying them any meaningful opportunity to comment on the
2   missing information; and by denying them the procedural safeguards embodied in NEPA to ensure
3   that government agencies carefully consider the environmental consequences of a proposed action,
4   environmentally superior alternatives to that action, and appropriate mitigation measures prior to
5   granting any project approval.  All of the injuries alleged in this and the preceding paragraph are
6   actual and concrete injuries caused by the defendants' failure to comply with their duties under
7   NEPA.

8       20.     Plaintiffs have no adequate remedy at law to address any of the foregoing injuries to
9   their interests.

10      21.     Defendant Ed Schafer is the Secretary of the U.S. Department of Agriculture.
11  Defendant Schafer is sued in his official capacity.

12      22.     Defendant Gail Kimbell is the Chief of the U.S. Forest Service, an agency within the
13  U.S. Department of Agriculture.  Defendant Kimbell is sued in her official capacity.

14      23.     Defendant U.S. Forest Service is an agency within the U.S. Department of
15  Agriculture that is charged with administration of the National Forest System.

16  ## THE NATIONAL FOREST SYSTEM

17      24.     The 193-million-acre National Forest System encompasses over 8 percent of the
18  geographic area of the United States and includes 155 national forests and 20 national grasslands in
19  42 states and the Commonwealth of Puerto Rico.

20      25.     The National Forest System provides many natural assets for the use and enjoyment
21  of all Americans and visitors from around the globe.  Stretching from the Pacific to the Atlantic,
22  from Alaska in the north to Puerto Rico in the south, the National Forest System contains a
23  spectacular array of landscapes, including boreal forests, remnants of the prairie grasslands that once
24  carpeted the interior of the continent, temperate and tropical rain forests, towering mountain ranges,
25  eastern hardwood forests, and bald cypress swamps, among many others.  These natural landscapes
26  are used and enjoyed by millions of visitors every year for sightseeing, hiking, wildlife observation,
27  winter sports, mountaineering, camping, biking, picnicking, and numerous other activities.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                              8

26.     National forests harbor much of the nation's biological diversity.  They are home to more than 3,000 species of birds, mammals, reptiles, fish, and amphibians, and more than 10,000 plant species, including more than 400 federally-listed endangered and threatened species (over 250 animal species and over 160 plant species), and more than 2,000 species designated as sensitive. National forests have significantly more intact populations of rare species than any other system of public lands in the United States.

27.     Importantly, national forests also encompass a broad array of ecosystems and habitat types, including large blocks of relatively unfragmented habitats that are critical to the continued existence of many of the large mammals that still persist in the United States, including grizzly bears, wolves, wolverines, lynx, elk, and bighorn sheep.  Accordingly, preserving existing wildlife populations in the National Forest System ensures preservation of some of the most rare and revered wildlife species remaining in our nation.

28.     The headwaters of many of the nation's rivers are located within the National Forest System, and the water that national forest watersheds provide is critical to drinking water supplies for many communities, fisheries, and domestic, agricultural, and industrial uses.  National forest streams, rivers, ponds, and lakes also provide a popular source of recreation, including boating, swimming, fishing, and aesthetic enjoyment.

### THE NATIONAL FOREST MANAGEMENT ACT

29.     Congress enacted the National Forest Management Act in 1976 to reform Forest Service management of the National Forest System, primarily by requiring stronger protection of non-timber resources, including wildlife, plants, water, and soils; by constraining the use of clearcutting and other harmful logging methods; and by requiring greater opportunities for public participation in national forest management.

30.     The NFMA implements its Forest Service reforms through a system of land management planning for the National Forest System.  The NFMA provides that "the Secretary shall in accordance with the procedures set forth in section 553 of Title 5, promulgate regulations . . . that set out the process for the development and revision" of land management plans for the National

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                          9

Forests, *i.e.*, forest plans, and further set out "the guidelines and standards prescribed by this subsection." 16 U.S.C. § 1604(g).

31.    The NFMA specifically requires the promulgation of NFMA Regulations specifying guidelines for forest plans that address a variety of specific resource management issues. 16 U.S.C. § 1604(g)(3). Among the explicit mandates of this subsection of the NFMA are regulations specifying guidelines that provide for the diversity of plant and animal communities in each national forest (§ 1604(g)(3)(B)); that restrict timber harvesting to avoid irreversible damage to soils, slopes, and watersheds and detrimental changes to waterways, wetlands, and riparian areas (§ 1604(g)(3)(E)); that restrict the use of clearcutting and other even-aged timber harvest methods (*i.e.*, harvest methods that result in a replacement stand of trees of identical age) and limit the size and regulate the shape of areas harvested by even-aged methods (§ 1604(g)(3)(F)); and that require the identification of the suitability of national forest lands for resource management (§ 1604(g)(2)(A)).

### THE 1982 NFMA RULE

32.    The Forest Service promulgated regulations pursuant to the NFMA's statutory mandate on September 30, 1982. *See* National Forest System Land and Resource Management Planning, 47 Fed. Reg. 43,026 (Sept. 30, 1982) (formerly codified at 36 C.F.R. pt. 219; cited here as "1982 Rule § __"). The 1982 Rule covers five major areas of the national forest planning process. First, it describes the content and role of "regional guides," which establish regional standards and guidelines for the nine regional divisions of the National Forest System. *See* 1982 Rule §§ 219.4(b)(2), 219.9. Second, it establishes a process for developing plans for individual administrative units of the National Forest System, *i.e.*, the various national forests and national grasslands. *See id.* § 219.12. Third, it establishes guidelines for determining where and how much logging can occur in the National Forest System. *See id.* §§ 219.14, 219.16. Fourth, it states specific planning requirements for a variety of resources, including wilderness, wildlife, grazing, recreation, minerals, water, and soil. *See id.* §§ 219.18-.25. Fifth, it establishes "minimum specific management requirements" for logging and other activities. *See id.* § 219.27.

33.    The 1982 Rule was promulgated based on the recommendations of an appointed Committee of Scientists, specifically mandated by the NFMA. 16 U.S.C. § 1604(h). The

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    10

1    Committee of Scientists, made up of members from outside the Forest Service who were experts in

2    various sciences relevant to national forest resources, convened a series of public meetings across

3    the country. On the basis of their collective expertise and the public input received, the Committee

4    of Scientists made recommendations to the Forest Service regarding the appropriate content of the

5    NFMA Regulations.

6        34.    The 1982 Rule established numerous important environmental safeguards for the

7    national forests. For example, it proscribed management practices within 100-foot buffer zones

8    around riparian areas that would "seriously and adversely affect water conditions or fish habitat"

9    (1982 Rule § 219.27(e)); required that wildlife habitat needs be taken into account in decisions

10    regarding livestock grazing (*id.* § 219.20); required management prescriptions to preserve and

11    enhance the diversity of plant and animal communities so that diversity is at least as great as that of a

12    natural forest (*id.* § 219.27(g)); and provided detailed standards and procedures for identifying

13    national forest lands not suitable or appropriate for timber production and for identifying timber

14    management intensities on lands that may be suitable for logging (*id.* § 219.14).

15        35.    With respect to wildlife, the 1982 Rule established a critical protection mandate to

16    implement the NFMA diversity requirement for the National Forest System. The drafters of the

17    1982 Rule recognized that, in order to sustain plant and animal communities in the national forests,

18    the Forest Service must maintain the individual species that make up those communities. The 1982

19    Rule therefore provides that "[f]ish and wildlife habitat shall be managed to maintain viable

20    populations of existing native and desired non-native vertebrate species in the planning area." *Id.* §

21    219.19; *see also id.* § 219.27(a)(6) (requiring Forest Service to "[p]rovide for adequate fish and

22    wildlife habitat to maintain viable populations of existing native vertebrate species"). It defines a

23    "viable population" as "one which has the estimated numbers and distribution of reproductive

24    individuals to insure its continued existence is well distributed in the planning area" and specifies

25    that "habitat must be provided to support, at least, a minimum number of reproductive individuals

26    and that habitat must be well distributed so that those individuals can interact with others in the

27    planning area." *Id.* § 219.19. Further, the 1982 Rule specifically requires that forest plans set

28    objectives for ESA-listed species "that shall provide for, where possible, their removal from

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                        11

1   listing...through appropriate conservation measures, including the designation of special areas to

2   meet the protection and management needs of such species." *Id.* § 219.19(a)(7).

3       36.    To implement the "viability" requirement, the 1982 Rule adopted a "canary in the

4   coal mine" approach.  It provided that certain wildlife species must be selected by the Forest Service

5   and monitored as proxies for the health of broader wildlife populations and of the specific

6   ecosystems these species inhabit.  Monitoring these proxy species enables the Forest Service to

7   determine whether its management activities are having adverse impacts on wildlife and ecosystems

8   without the necessity of monitoring all species occupying the forest.  Specifically, the 1982 Rule

9   provides that "certain vertebrate and/or invertebrate species present in the area shall be identified and

10   selected as management indicator species" based upon a finding that "their population changes are

11   believed to indicate the effects of management activities." *Id.* § 219.19(a)(1).  The rule further

12   provides that "[p]opulation trends of the management indicator species will be monitored and

13   relationships to habitat changes determined." *Id.* § 219.19(a)(6).  It also requires that forest plans

14   must provide that habitat for management indicator species is "maintained and improved to the

15   degree consistent with multiple-use objectives." *Id.* § 219.27(a)(6).  The wildlife viability and

16   management indicator species rules are second only to the Endangered Species Act in their

17   importance as a federal protection for species conservation and are an important complement to the

18   ESA in that they help identify and correct species declines before the emergency measures of the

19   ESA are needed.

20       37.    By its express terms, the 1982 Rule's specific management requirements apply not

21   only to the development, revision, and amendment of forest plans, but also to the implementation of

22   forest plans through specific projects and actions. *Id.* § 219.27.

23       38.    However, since adopting the 1982 Rule, and forest plans pursuant to it, the Forest

24   Service frequently failed to comply with its provisions, particularly with respect to the regulatory

25   requirement that the agency obtain data necessary to determine population trends of management

26   indicator species and their relationships to habitat changes caused by national forest management

27   activities.  As a result, numerous federal courts have invalidated decisions by the Forest Service to

28   undertake site-specific logging and other environmentally harmful projects in the National Forests in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF         12

1  the absence of such data and well-founded determinations. *See, e.g., The Land Council v. Powell*,

2  379 F.3d 738 (9th Cir. 2004), *amended* 2005 U.S. App. LEXIS 1153 (9th Cir. 2005); *Utah*

3  *Environmental Congress v. Bosworth*, 372 F.3d 1219 (10th Cir. 2004); *Idaho Sporting Congress v.*

4  *Rittenhouse*, 305 F.3d 957 (9th Cir. 2002); *Sierra Club v. Martin*, 168 F.3d 1, 7 (11th Cir. 1999);

5  *Forest Guardians v. U.S. Forest Service*, 180 F. Supp. 2d 1273 (D.N.M. 2001); *Utah Environmental*

6  *Congress v. Zieroth*, 190 F. Supp. 2d 1265 (D. Utah 2002).

7    39.    Thus, the 1982 Rule's wildlife requirements have acted as a significant check upon

8  the Forest Service when the agency has attempted to implement environmentally harmful projects

9  without taking the basic steps required by the rule to ensure that its actions are not pushing resident

10  wildlife populations past the point of viability.

11                          **THE 2000 NFMA RULE**

12    40.    Since promulgation of the 1982 NFMA Regulations, the Forest Service has initiated

13  several attempts to revise them. All such attempts were abandoned due to controversy until, in late

14  1997, then-Secretary of Agriculture Dan Glickman convened a new independent Committee of

15  Scientists, as expressly authorized by the NFMA, to provide guidance to the Forest Service on how

16  to revise and update the NFMA Regulations. 16 U.S.C. § 1604(h)(1). Like the earlier Committee of

17  Scientists, this group convened a series of meetings across the country in 1998 to invite public

18  participation in their deliberations. In March 1999, the Committee provided the Forest Service a

19  193-page set of recommendations regarding potential revisions to the NFMA regulations. Taking

20  the Committee of Scientists' recommendations into account, the Forest Service published a proposed

21  rule revising the NFMA regulations on October 5, 1999 (64 Fed. Reg. 54,074) and adopted a final

22  rule on November 9, 2000. *See* National Forest System Land and Resource Management Planning,

23  65 Fed. Reg. 67,514 (formerly codified at 36 C.F.R. pts. 217 and 219).

24    41.    The 2000 Rule established detailed provisions for managing wildlife and other

25  resources in the national forests, including revisions to the wildlife "viability" provision of the 1982

26  NFMA Regulations that retained the species viability approach. The rule requires that forest plan

27  decisions affecting species diversity must provide for ecological conditions that provide a high

28  likelihood of supporting viable populations of "native and desired non-native species well distributed

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    13

1  throughout their ranges within the plan area." 2000 Rule, former 36 C.F.R. § 219.20(b)(2)(i).

2  Where circumstances prevent meeting this standard of "high likelihood" that the viability of a given

3  species will be adequately protected, the 2000 Rule still requires actions protective of that species'

4  viability. *Id.* § 219.20(b)(2)(ii)-(iv).

5        42.    The 2000 Rule included wildlife monitoring requirements akin to the management

6  indicator species requirements of the 1982 Rule. It called for identification and monitoring of "focal

7  species," any given species to be so designated because "its status and trend provide insights to the

8  integrity of the larger ecological system to which it belongs." *Id.* § 219.36. Under the 2000 Rule,

9  monitoring "must be used to evaluate focal species" by monitoring the "status and trends of

10  ecological conditions known or suspected to support" these species. *Id.* § 219.11(a)(1)(ii)(A). It

11  also provided for population monitoring of focal species. *Id.* § 219.11(a)(1)(ii)(B), (C).

12        43.    The 2000 Rule required that forest plans "must provide for implementing actions in

13  conservation agreements…that provide a basis for not needing to list species" and "should reflect the

14  unique opportunities that National Forest System lands provide to contribute to recovery of listed

15  species." *Id.* § 219.20(b)(3)(i).

16        44.    The 2000 Rule required that the "first priority for stewardship of the national forests

17  and grasslands is to maintain and restore ecological sustainability." 2000 Rule § 219.19. To ensure

18  that this priority is met, the 2000 Rule required "the development and analysis of information

19  regarding [ecosystem diversity and species diversity, identified as 'components of ecological

20  sustainability'] at a variety of temporal and spatial scales." *Id.* § 219.20(a). The scales for which

21  information is to developed and analyzed include geographic areas such as bioregions and

22  watersheds, scales of biological organization such as communities and species, and scales of time

23  from months to centuries. *Id.* The 2000 Rule requires the Forest Service, in carrying out its duties to

24  promote ecological sustainability in the forest planning process, to develop detailed information

25  regarding the national forest's major vegetation types, water resources, soils, air resources, and

26  species. *Id.* § 219.20(a)(1). It sets out a detailed list of factors to be evaluated in determining how to

27  protect and restore ecosystem and species diversity, including the effects of human activities, the

28  effects of air quality, the effects of uses of water, the quantity and quality of water needed to support

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    14

1    ecosystem diversity and ecological sustainability, and the current viability of existing species . *Id.* §

2    219.20(a)(2). The 2000 Rule also details how all of this information is to be used in making forest

3    plan decisions that affect ecosystem diversity, species diversity, and ESA-listed species. *Id.* §

4    219.20(b).

5      45. The 2000 Rule provides that: "The regulations in this subpart [*i.e.*, the 2000 Rule

6    itself]…guide the selection and implementation of site-specific actions." *Id.* § 219.1(a).

7    <center>**THE 2005 NFMA RULE**</center>

8      46. As matters turned out, the 2000 Rule never replaced the 1982 Rule as the basis for

9    developing or revising forest plans. A new administration assumed control of the Forest Service

10    shortly after publication of the 2000 Rule. That administration decided to craft its own set of NFMA

11    Regulations to replace the 2000 Rule. On May 17, 2001, the Secretary of Agriculture postponed the

12    effective date upon which the 2000 Rule would apply to the amendment or revision of land

13    management plans, observing that this postponement would allow the Forest Service to review the

14    regulations and determine whether adjustments were necessary in light of allegedly difficult-to-

15    implement provisions. *See* 66 Fed. Reg. 27,552 (to be codified at 36 C.F.R. 219.35(b)). On May 20,

16    2002, the Forest Service published an "interim final rule" in the Federal Register that provided that,

17    until revised NFMA Regulations were promulgated, Forest Service officials could continue to

18    conduct forest plan amendments or revisions under the 1982 Rule if they so chose, rather than under

19    the 2000 Rule. 67 Fed. Reg. 35,431-34. Not a single national forest chose to revise or amend its

20    forest plan under the 2000 Rule. *See* 70 Fed. Reg. at 1022.

21      47. On December 6, 2002, the Forest Service published a new set of proposed NFMA

22    regulations, a significant revision of the 2000 Rule ("2002 Proposed Rule"). *See* National Forest

23    System Land and Resource Management Planning, 67 Fed. Reg. 72,770 (Dec. 6, 2002) (to be

24    codified at 36 C.F.R. pt. 219). At no time prior to proposing the significant revisions encompassed

25    by the 2002 Proposed Rule did the administration appoint a new Committee of Scientists or formally

26    consult with the previous committee, nor did it do so during the remainder of the protracted

27    rulemaking process that followed. The potential environmental impacts of the 2002 Proposed Rule

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF            15

1    were not analyzed pursuant to NEPA, based on an assertion that the promulgation of these

2    regulations could be categorically excluded from NEPA review. 67 Fed. Reg. at 72,793.

3          48.     On December 22, 2004, more than two years after publication of the proposed rule,

4    the Forest Service announced the completion of its final set of new NFMA Regulations. The 2005

5    Rule, along with related materials, was published in the Federal Register January 5, 2005. *See*

6    National Forest System Land and Resource Management Planning; Removal of 2000 Planning Rule;

7    National Environmental Policy Act Documentation Needed for Developing, Revising, or Amending

8    Land Management Plans; Categorical Exclusion; Final Rules and Notice, 70 Fed. Reg. 1021 (Jan. 5,

9    2005). The material published in the Federal Register included a final rule rescinding the 2000 Rule

10   by removing it from 36 C.F.R. part 219, subpart A, with a stated effective date of January 5, 2005

11   (*Id.* at 1022-23); the final 2005 NFMA Rule, also with a stated effective date of January 5, 2005, and

12   a lengthy preamble to the new regulations (*id.* at 1023-61); and a proposed categorical exclusion

13   from the requirements of NEPA for the future development, revision, or amendment of forest plans

14   (*id.* at 1062-66; proposed for inclusion in Forest Service Handbook 1909.15, Chap. 30). The Federal

15   Register notice further revealed that the Forest Service did not consult with federal wildlife

16   protection agencies regarding the potential effects of the new rule on federally-listed endangered and

17   threatened species, as required by the ESA, based on an assertion that the rule "simply establishes a

18   process for planning," purportedly without any potential effects on listed species. *Id.* at 1035.

19         49.     The 2005 Rule differed substantially from the 2002 Proposed Rule upon which public

20   comment had been sought in a variety of ways that the public could not have foreseen from the

21   content of the proposed rule. While the 2002 Proposed Rule was characterized in its preamble

22   materials as an "adjustment" to the 2000 NFMA Rule that retained aspects of those regulations, the

23   preamble to the 2005 Rule characterized the final regulations as a "paradigm shift" in national forest

24   land management planning from previous NFMA Regulations. 70 Fed. Reg. at 1024. The

25   "paradigm shift" effected by the 2005 Rule was the elimination from the NFMA Regulations of

26   enforceable substantive standards governing the content of land management plans for the national

27   forests, including the elimination of a series of standards that the NFMA itself requires be included

28   in these regulations. The NFMA requires that "the Secretary shall . . . promulgate regulations . . .

that set out . . . the guidelines and standards prescribed by this subsection." 16 U.S.C. § 1604(g). In deleting the NFMA-mandated and other standards from the regulations, the 2005 Rule eliminated the very word "standard" from the regulations. The forest plans that the NFMA requires be drafted, revised, and amended in accordance with the NFMA Regulations were repeatedly characterized in the 2005 Rule's preamble as "strategic" and "aspirational," rather than "prescriptive," despite the fact that the NFMA explicitly prescribes a series of resource protection standards that must be included in the NFMA Regulations and reflected in the forest plans formulated pursuant to those regulations.

50.    The standards that the NFMA requires be provided in the planning regulations, but that were deleted from the 2005 Rule, encompassed the most fundamental environmental protection requirements that Congress sought to impose in enacting the NFMA. These deleted standards included a variety of explicit limitations on logging, standards for protecting wildlife diversity, the requirement that specific actions on a national forest be consistent with the forest plan, and the requirement that plan amendments be made with public participation. The 2005 Rule also eliminated a number of other requirements for environmental protection that were contained in the 1982 and/or 2000 Rules, including standards requiring the protection of the viability of individual species, requiring the identification and monitoring of specific species as a measure of ecosystem health, proscribing management activities within 100 feet of water bodies posing damage to water conditions and fish habitat (1982 Rule), and requiring that ecological sustainability be the first priority in forest management (2000 Rule).

51.    The 2005 Rule also introduced a novel requirement that every national forest adopt an "environmental management system" ("EMS"), a vaguely defined system of tracking management actions borrowed from the business sector. *See* 70 Fed. Reg. at 1056 (Jan. 5, 2005), § 219.5. This requirement does not exist in the 1982 Rule, the 2000 Rule, the 2002 Proposed Rule, or the NFMA itself. The 2005 Rule made an EMS for each national forest a central part of forest management, requiring all future forest plans, plan revisions, and plan amendments to be completed in accordance with the EMS. The EMS requirement is intended to supplant the rigorous analysis of the environmental impacts of forest plans required by NEPA. The NFMA explicitly requires that forest

1   planning comply with NEPA (16 U.S.C. § 1604(g)(1)), and NEPA requires an environmental impact

2   statement on all major federal actions significantly affecting the human environment, 42 U.S.C. §

3   4332(c), including the adoption of plans and guidance documents. 40 C.F.R. § 1508.18(b).  The

4   1982 and 2000 Rules recognized the significant impact forest plans have on the environment and

5   required an EIS on each forest plan adoption or revision.  *See* 1982 Rule § 219.10(b); 2000 Rule §

6   219.9(d).  In contrast, the 2005 Rule was accompanied by a proposal to allow forest plans to be

7   "categorically excluded" from NEPA analysis on the assertion that these plans have no

8   environmental effects. 36 C.F.R. § 219.4, Notice of proposed National Environmental Policy Act

9   implementing procedures; request for comment, 70 Fed. Reg. 1062-1066 (Jan. 5, 2005) (to be

10  included in Forest Service Handbook 1909.15 Chapters 30.3, 31.2, 32.2). This proposal has since

11  been adopted, in contravention of NEPA's EIS requirement.  Thus, the 2005 Rule left the public

12  with the standardless EMS process in lieu of the rigorous, well-defined NEPA analysis of

13  environmental effects, alternatives, and mitigation measures, and equally well-defined opportunities

14  for public review and comment, that forest plan EISs provided under the 1982 and 2000 Rules.

15          52.     Plaintiffs in the instant action challenged the 2005 Rule as having been promulgated

16  in violation of the APA and NEPA.  *Defenders of Wildlife, et al. v Johanns, et al.*, no. 04-4512 PJH,

17  First Supplemental Complaint (N.D. Cal., filed Feb. 17, 2005).  A second case challenging the 2005

18  Rule also alleged that it had been promulgated in violation of the ESA.  *Citizens for Better Forestry,*

19  *et al. v. U.S. Dept. of Agriculture, et al.*, no. 05-1144, Complaint (N.D. Cal., filed Mar. 21, 2005).

20  These cases were consolidated for briefing and argument on motions for summary judgment, and, on

21  March 30, 2007, the District Court ruled that the 2005 Rule had been promulgated in violation of the

22  requirements of the APA, NEPA, and ESA, set aside the regulations, and issued an injunction

23  against their implementation until such time as the statutory violations were cured.  *Citizens for*

24  *Better Forestry v. USDA*,  481 F.Supp.2d 1089, 1100 (N.D. Cal. 2007).

25          53.     Following their unsuccessful motion to alter or amend the District Court's summary

26  judgment ruling, federal defendants filed a notice of appeal on August 30, 2007.  However, this

27  appeal and a companion appeal by timber industry defendant-intervenors were voluntarily dismissed

28  through an unopposed motion granted January 14, 2008.

# THE 2008 NFMA RULE

54.     Before abandoning their appeal, defendants republished the 2005 Rule as a proposed rule ("2007 Proposed Rule") on August 23, 2007.  72 Fed. Reg. 48,514 (Aug. 23, 2007).  The public comment period ran until October 22, 2007.  *Id.* at 48,515.  As with the promulgation of the 2005 Rule, the Forest Service did not convene a new Committee of Scientists nor consult with the former committee regarding the proposed rule.  A document entitled Draft Environmental Impact Statement National Forest System Land Management Planning ("DEIS"), purportedly analyzing the environmental effects of the 2007 Proposed Rule and four alternatives, was published simultaneously with the 2007 Proposed Rule, and public comments on the DEIS were likewise received until October 22, 2007.  *Id.* at i.

55.     The DEIS included four alternatives to the 2007 Proposed Rule for analysis, while eliminating four other potential alternatives suggested by members of the public in response to the notice of intent to prepare an EIS.  DEIS at 13-23.  The four alternatives included were:  Alternative B, the "no action" alternative, which is the 2000 Rule as it existed before promulgation of the 2005 Rule; Alternative C, the 1982 Rule; Alternative D, the 2005 Rule modified to delete the requirements regarding environmental management systems; and Alternative E, the 2005 Rule modified to delete the EMS requirements, to allow forest plans to contain standards, to add direction regarding identification of lands unsuitable for timber harvest, and to add various timber management requirements from the NFMA.  *Id.* at 13-21.

56.     While NEPA requires an EIS to take a "hard look" at the environmental impacts of the proposed action and of the various alternatives considered and provide a fair comparison of the impacts of the alternatives to those of the proposal, the DEIS simply denied that any of the five alternatives considered (including the 2007 Proposed Rule) would have *any* environmental impacts: "The proposed planning rule and the alternatives are all the same in that they would have no direct, indirect, or cumulative impact on the human environment."  *Id.* at 23.  Not surprisingly, given that unfounded denial, the DEIS's comparison of the alternatives to the 2007 Proposed Rule contains no analysis whatsoever of the different levels of impacts the alternatives would have on the resources of the national forests, despite that fact that the alternatives range from the 1982 Rule, with its detailed

1    substantive requirements to protect wildlife and other natural resources, to the standardless 2007

2    Proposed Rule. *Id.* at 23-27. Similarly, all of the other discussions in the short DEIS are premised

3    on the notion that none of the five alternative sets of regulations to govern the management of every

4    acre of the 193-million-acre National Forest System has any direct, indirect, or cumulative impacts

5    on that vast area of public lands. The DEIS utterly failed to provide the "hard look" at the

6    environmental consequences of the 2007 Proposed Rule that NEPA demands.

7        57.    On February 7, 2008, the Forest Service released the Final Environmental Impact

8    Statement National Forest Service Land Management Planning ("FEIS"). That document revealed

9    that the final NFMA Regulations to be adopted, called Alternative M in the FEIS, were the 2007

10   Proposed Rule (*i.e.*, the 2005 Rule invalidated by this Court) modified by the inclusion of broad

11   direction regarding identification of lands unsuitable for timber harvest and of various timber

12   management requirements largely taken verbatim from the NFMA and by a few other minor

13   changes. FEIS at 26-28. Except for those modest modifications, Alternative M is substantially

14   identical to the 2005 Rule. *Id.* Despite numerous public and agency comments regarding the

15   DEIS's failure to reveal and examine the environmental impacts of the proposed new regulations and

16   the alternatives, the FEIS simply repeated the DEIS's statement that none of the alternatives would

17   have any environmental impacts. *Id.* at 32. Like the DEIS, the FEIS offers no analysis of the

18   different environmental impacts likely to result from Alternative M, which is largely devoid of

19   substantive standards, let alone detailed requirements for protection of biological diversity and other

20   natural resources, as compared to the alternatives of the 1982 Rule and the 2000 Rule, which

21   provided such resource protection standards and requirements.

22       58.    Moreover, while the substantive resource protections in both the 1982 and 2000 Rules

23   directly governed site-specific projects and activities, as well as the content of forest plans (*see* 1982

24   Rule § 219.27; 2000 Rule § 219.1), Alternative M expressly states that, "[e]xcept as specifically

25   provided, none of the requirements of this subpart apply to projects or activities" (FEIS at D-2 (36

26   C.F.R. § 219.2(c))) and terminates the application of the provisions of the 1982 Rule to the

27   management of national forests currently operating under forest plans created pursuant to the 1982

28   Rule (*id.* at D-15 (36 C.F.R. 219.14(b)(4))). That is, both previous versions of the NFMA

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    20

1    Regulations provided standards that directly governed actions on the national forests, while

2    Alternative M negates any such application and nullifies the application of the 1982 Rule to existing

3    forest plans created under its requirements.  Despite this, the FEIS disingenuously concludes that

4    none of the alternatives "dictate[s] how administrative units of the [National Forest System] are to be

5    managed," as support for its overall assertion that none of the alternatives has any environmental

6    impacts.  FEIS at 51.

7        59.    The 2008 Rule also perpetuates the EMS requirement, in a slightly modified form, as

8    a substitute for the analysis that was formerly provided by EISs on forest plans.  36 C.F.R. § 219.5.

9        60.    The 2008 Rule allows significant changes to be made in forest plans without treating

10   these as plan amendments for which the NFMA requires public notification and participation.  16

11   U.S.C. § 1604 (f)(4).  In particular, the 2008 Rule expressly allows the monitoring program and the

12   timber management projections (as well as other resource use projections) in a forest plan to be

13   changed as "administrative corrections," which may be made at any time by Forest Service officials

14   and are not subject to the public participation requirements for plan amendments.  36 C.F.R. §

15   219.7(b)(3), (4).  Both the monitoring program and timber management projections (i.e., the amount

16   of timber the Forest Service projects can be produced sustainably from the national forest) are

17   central components of a forest plan, components that the public has great interest in because of their

18   importance in guiding management of the national forest.

19       61.    On April 9, 2008, the Forest Service issued a Record of Decision that adopted

20   Alternative M as its final set of revised NFMA regulations.  These final regulations, the 2008 Rule,

21   and the Record of Decision were published in the Federal Register on April 21, 2008.  73 Fed. Reg.

22   21468-512.

23       62.    In sum, the 2008 Rule, like the 2005 Rule it so closely resembles, strips the NFMA

24   Regulations of virtually all detailed substantive standards to protect and guide the management of

25   the National Forest System.  This elimination of enforceable standards from the NFMA Regulations

26   without analysis of the environmental impacts of the new regulations that accomplish that

27   elimination, compared to the impacts of the alternatives of the 1982 and 2000 Rules, is a clear

28   violation of NEPA and its implementing regulations.  Merely issuing a document entitled

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                              21

"Environmental Impact Statement" that contains none of the required analysis of the environmental impacts of the proposed rule or any of the alternatives cannot pass muster under NEPA.

## FIRST CLAIM FOR RELIEF

### Violation of NEPA and APA:
### Failure to Prepare Adequate EIS on 2005 NFMA Rule

63.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

64.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. Among other things, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement is commonly known as an environmental impact statement or EIS. A "major federal action" upon which an EIS may be required includes "new or revised agency rules [and] regulations." 40 C.F.R. § 1508.18(a). The environmental "effects" that must be considered in an EIS include "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," as well as direct effects. *Id.* § 1508.8. An EIS must also consider the cumulative impacts of the proposed action, that is, the environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* § 1508.7; *see also* § 1508.27(b)(7).

65.    The contents required for an adequate EIS are detailed in 40 C.F.R. part 1502. Among these requirements, an EIS must consider alternatives to the proposed action and "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice" among the alternatives. *Id.* § 1502.14. The consideration and evaluation of alternatives "is the heart of the [EIS]." *Id.* The alternatives analysis must "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." *Id.* § 1502.14(b).

66.    An EIS must detail the environment consequences of the alternatives under consideration. *Id.* § 1502.16. The examination of environmental consequences "forms the scientific

1  and analytical basis" for the required comparison of alternatives. *Id.* The discussion of

2  environmental consequences must include "the environmental impacts of the alternatives including

3  the proposed action, any adverse environmental impacts that cannot be avoided should the proposal

4  be implemented, the relationship between the short-term uses of man's environment and the

5  maintenance and enhancement of long-term productivity, and any irreversible or irretrievable

6  commitments of resources which would be involved in the proposal should it be implemented." *Id.*

7  The discussion should also include means to mitigate adverse environmental impacts of the project.

8  *Id.* § 1502.16(h).

9       67.    "Agencies shall ensure the professional integrity, including scientific integrity, of the

10  discussions and analyses" in an EIS. *Id.* § 1502.24.

11       68.    The record of decision on a project for which an EIS is required must specify "the

12  alternative or alternatives which were considered to be environmentally preferable" and state

13  "whether all practicable means to avoid or minimize environmental harm from the alternative

14  selected have been adopted" and, if not, why not. *Id.* § 1505.2(b), (c).

15       69.    Defendants' approval of the 2008 NFMA Rule, which strips the NFMA Regulations

16  of resource management standards required by the NFMA and contained in prior versions of these

17  regulations, standards that provided concrete protections for natural forests, wildlife and fish,

18  watersheds, and other environmental resources, is undoubtedly a major federal action significantly

19  affecting the human environment within the meaning of 42 U.S.C. § 4332(2)(C) for at least the

20  following reasons:

21       a.    The National Forest System has a multitude of unique geographic

22  characteristics, including recreation areas, designated wilderness, wild and scenic rivers, and

23  ecologically critical areas within the meaning of 40 C.F.R. § 1508.27(b)(3)

24       b.    The effects of the 2008 Rule on the quality of the human environment are

25  likely to be "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4);

26       c.    The possible effects on the human environment involve "unique [and]

27  unknown risks" within the meaning of 40 C.F.R. § 1508.27(b)(5);

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF         23

1        d.    The action "may establish a precedent for future actions with significant

2 effects" within the meaning of 40 C.F.R. § 1508.27(b)(6);

3        e.    The action "may adversely affect an endangered or threatened species or its

4 [critical] habitat" within the meaning of 40 C.F.R. § 1508.27(b)(9); and

5        f.    The action threatens a violation of federal law imposed for the protection of

6 the environment, namely 16 U.S.C. § 1604(g)(3) of the NFMA, within the meaning of 40 C.F.R. §

7 1508.27(b)(10).

8 Consequently, defendants were obligated to prepare an EIS on the 2005 NFMA Rule before

9 approving it.

10      70.    The FEIS that the defendants prepared for the 2008 Rule violates NEPA in a variety

11 of respects, including but not limited to those described in the following paragraphs.

12      71.    The FEIS violates NEPA in failing to acknowledge, let alone compare, the impacts of

13 the various alternatives, markedly different regulatory schemes for the management of the National

14 Forest System. 40 C.F.R. § 1502.14. These regulatory alternatives range from the 1982 Rule, with

15 its detailed substantive requirements for the protection of wildlife and other natural resources and its

16 direct application of these requirements to on-the-ground actions, to the 2008 Rule, which lacks any

17 detailed resource protection standards and is expressly inapplicable to site-specific projects and

18 activities. The FEIS's unfounded assertion that there is no difference in the environmental impacts

19 that would result from implementation of each of the various alternatives is unsupported by any

20 credible evidence and, indeed, contradicted by the alternatives on their face. This failure to compare

21 the environmental impacts of the alternatives is arbitrary, capricious, an abuse of discretion, not in

22 accordance with law, and without observance of procedure required by law within the meaning of

23 the APA, 5 U.S.C. § 706(2).

24      72.    The FEIS violates NEPA by failing to analyze the direct, indirect, and cumulative

25 impacts of the 2008 Rule and the alternatives, to identify adverse impacts that cannot be avoided if

26 the proposal is implemented, to examine the implications of the proposal's impacts on short-term

27 uses of the environment and the maintenance and enhancement of long-term productivity, and to

28 identify any irreversible or irretrievable commitments of resources, such as loss of species diversity

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                         24

1   and old growth forests, which the proposal could cause if implemented. 40 C.F.R. § 1502.16. The

2   unexamined impacts of the 2008 Rule and its alternatives include, but are not limited to, impacts on

3   wildlife, plants, ecosystem diversity and health, water quality and quantity, soils, wildfires, and

4   global climate change. The FEIS's wholesale failure to acknowledge, let alone identify and analyze,

5   environmental impacts of the alternatives is arbitrary, capricious, an abuse of discretion, not in

6   accordance with law, and without observance of procedure required by law within the meaning of

7   the APA, 5 U.S.C. § 706(2).

8       73.    Having failed to analyze environmental impacts, the FEIS has also failed to identify

9   means to mitigate adverse environmental impacts of the 2008 Rule. 40 C.F.R. § 1502.16(h). This

10  failure to identify mitigation measures is arbitrary, capricious, an abuse of discretion, not in

11  accordance with law, and without observance of procedure required by law within the meaning of

12  the APA, 5 U.S.C. § 706(2).

13      74.    The Forest Service has violated NEPA in failing to perform its duty to ensure the

14  professional integrity, including scientific integrity, of the discussions and analyses in the EIS by

15  basing its conclusion that none of the alternatives has any environmental impacts on transparently

16  false statements such as that none of the alternatives "dictate[s] how administrative units of the

17  [National Forest System] are to be managed" (FEIS at 51), when the 1982 and 2000 Rules both

18  expressly apply substantive requirements directly to on-the-ground management of the national

19  forests. Id. § 1502.24. The Forest Service's failure to perform its duty to ensure the professional

20  integrity of the discussions and analyses in the EIS is arbitrary, capricious, an abuse of discretion,

21  not in accordance with law, and without observance of procedure required by law within the

22  meaning of the APA, 5 U.S.C. § 706(2).

23      75.    The Forest Service has violated NEPA by issuing a Record of Decision that fails to

24  specify "the alternative or alternatives which were considered to be environmentally preferable" and

25  that further fails to state "whether all practicable means to avoid or minimize environmental harm

26  from the alternative selected have been adopted" and, if not, why not. 40 C.F.R. § 1505.2(b), (c).

27  This failure, which results from the Forest Service's refusal to acknowledge that the alternatives

28  have environmental impacts, is arbitrary, capricious, an abuse of discretion, not in accordance with

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                              25

1   law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C.

2   § 706(2).

3                                    **REQUEST FOR RELIEF**

4          Therefore, plaintiffs request that this Court:

5          1.     Hold unlawful and set aside the defendants' April 21, 2008 rulemaking pursuant to 5

6   U.S.C. § 706;

7          2.     Enter a declaratory judgment that the defendants violated the National Environmental

8   Policy Act and its implementing regulations and the Administrative Procedure Act in promulgating

9   the 2008 Rule and that the EIS on the 2008 Rule is legally inadequate;

10         3.     Enjoin the defendants from applying or otherwise relying upon the April 21, 2008

11  rulemaking;

12         4.     Award plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees,

13  associated with this litigation; and

14         5.     Grant plaintiffs such further and additional relief as the Court may deem just and

15  proper.

16  DATED: May 6 , 2008                         Respectfully submitted,

17

18

19                                             TRENT W. ORR
20                                             GREGORY C. LOARIE
                                               TIMOTHY J. PRESO
21                                             SIERRA B. WEAVER

22                                             Counsel for Plaintiffs

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                          26